The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. All right, our first case is Smith v. Devine and Mr. Coppola, are you ready? Yes, both of you come up. All right, when you're ready, sounds good. Good morning, Your Honor. Your Honor, may it please the Court. My name is Anthony Coppola. I'm the attorney for the appellants slash defendants in this, the matter of Smith v. Devine. This case is about a $31 million default judgment, an evidentiary default, against defendants who showed up in court, tried to argue their case, and spent six figures doing so. They spent about $180,000 and didn't get their fair adversarial proceeding. There are two major issues with this outcome, and if you remember nothing else that I say today, remember these two things. One, the size of the judgment is huge. It's $31 million. It's unduly severe, and it's not tied to the amounts actually alleged or owed. Two, the prejudice to the plaintiff is essentially nonexistent. Without that prejudice, the reason for default just isn't there. Now, a default, by its nature, is somewhat problematic. It has the ability to frustrate due process. In the case of defaults, as here, parties don't get their fair day in court. They don't get their adversarial proceeding. So defaults need to be used very carefully. Let's talk about the size. $31 million is a lot of money. It's at least $12 million more than the total debts of the bankruptcy estate, as stated in the complaint. Let me ask you this. Of course. Don't you all, before the bankruptcy court, there's this agreement between the parties in calculating how the bankruptcy court comes up with that number? There is, but the... I think the district court said the argument's not preserved as to the sum, because there's this agreement between the parties as to the number. I don't think we had an agreement. I was not the attorney in the bankruptcy court, but I spoke to the bankruptcy attorney fairly extensively. The way the number came up is it's not the debts of the bankruptcy estate. There's sort of a range of what the debts were, from somewhere between $5 and $20 million. What happened here was they went after my clients for alleged transfers out of the bankruptcy estate, and actually calculated a sum far higher than the transfers alleged. There was a $2.9 million notice from a QuickBooks file. I see that this was a large judgment. It is. But there are also a large number of corporate entities. There are. I don't know, there's something like 54 different corporate entities. There were 12... I'm sorry. So there's a rather extensive scheme, and one might remark that the size of the judgment reflects to some extent the number of corporate entities to which funds were transferred. The other thing is that your unwillingness to respond to discovery requests gave the District Judge, or the bankruptcy judge in this case, rather little to work with. And you say, oh, well, this isn't precise enough, but part of the lack of precision was brought about by the unwillingness of the divine affiliates to give the District Court any information. That brings it to my point about prejudice, which I think is exactly relevant here. My clients are accused of not producing documents. My clients produced approximately 3,000 documents through discovery. They answered about 86 percent of the interrogatories to the satisfaction of the bankruptcy court. There were 269 interrogatories. But the bigger issue of prejudice is that that kind of gets to the prejudice against the plaintiff. And I don't think there is prejudice here, because the plaintiff had all of the debtor's records, all of BK Racing's records, had every bank statement, had all the relevant documents, had about a million pages of documents. Now, I've heard it called 800,000, I've heard it called 1.2 million. Mr. Smith says that it's 11.4 gigabytes broken into 8,000-ish files. But they had a lot of documents. There was not a total lack there. And when you talk about breaking about a lot of entities, I represent 12 individuals and corporations. And the issue here is the court pierced the corporate veil. It actually sort of pierced the corporate veil on steroids. Did the court actually say it's piercing the corporate veil? It did not say it was piercing. It did an analysis that suggested that they were looking at that. You're absolutely right. It did an analysis that suggested they were looking at piercing the corporate veil. And what the court actually did was consider all of them as one, all of the corporate entities and the people. It ignored the separateness, the corporate separateness. Because when you pierce the corporate veil, what happens is there is essentially an avenue from which liability may flow, say from a corporation to an individual. The corporate veil blocks that with limited liability. Piercing the corporate veil gets rid of that limited liability, but only opens the avenue if the avenue is there. What happened here is the avenue wasn't there. The court just mashed all of them together into a single block, sticking them all with the $31 million default judgment. Ron Devine? What is the standard of review that this court has? I think the standard of review is de novo review, because there shouldn't have been evidentiary findings based on default. What authority do you cite for the premise? Because some of the cases would suggest that it's an abuse of discretion standard. That's understandable. Where do you get the idea that this is de novo? I mean, I thought that default judgments are one of those things we've always reviewed under an abuse of discretion standard. I think it's a matter of law. I think it should be. I'm not totally opposed to an abuse of discretion. But you're saying because I disagree with it, the review should be de novo. You're saying because I disagree with the judgment below, that our review should be de novo. Well, I'm not necessarily saying that it's a revision of the judgment below. What I'm saying is the issue is, it's about the test used below. And it's about whether the correct test was used and whether the correct law was applied. I think it's, as I said, it's an overly large judgment. We have the case of GEMSEC, which specifically relates to the size of a judgment calling a $10 million default judgment unduly severe. Let me read something from the bankruptcy court notes. And this is compelling, particularly when we're looking at it as an abuse of discretion. Of course. It says, defendants have demonstrated, quote, a willful disregard for the bankruptcy laws, their duties as officers and directors of the debtor, their duties in discovery, and the rights of their creditors. They've repeatedly failed to make discovery, even after being ordered to do so by the bankruptcy court multiple times, and warned that they would face sanctions. That's pretty exhaustive review of the record in this matter, isn't it? It is an exhaustive review of the record. But again, it doesn't, it, I'm of the opinion that the district court shouldn't have been reviewing the record as much as reviewing the law that was being used and that was being argued. So, like I said, that kind of, that gets back to GEMSEC, which is saying that there's a certain size of default judgment. That's not exactly what GEMSEC says. GEMSEC says because they were not able to show prejudice. It does not address the excessive amount of, that's the finding in GEMSEC is based on the inability to show prejudice. There's a quote in my brief, and I don't have my brief up here, from GEMSEC that actually says that there was a finding of bad faith, but they were able to overlook the finding of bad faith because of the size of the judgment. But you would agree that GEMSEC, the reason that that case, the issue in that case was the, because the court did not cite prejudice in it.  Okay. No, I agree. It's not a perfect, it's not a perfect piece of precedent. No piece of precedent it is, but it is what it is. See, the default really, I think the issue is it's non-evidentiary by its nature. I think the courts below erred in not making enough of a distinction between the evidentiary and the non-evidentiary. You know, the bankruptcy court entered a 70-page order, considered numerous evidentiary points, and it said there was a substantial evidentiary record. But at the same time that it says there's a substantial evidentiary record, it's defaulting my clients for not producing enough evidence. There is evidence there. And when you were talking a minute ago about the prejudice in GEMSEC, the behavior, I think the prejudice just isn't here because the plaintiffs had such a large body of documents. In this case, though, to come up with the $31 million determination, it seems that the court was able to identify two criteria that they could use to come up with a figure and then use the ability to trouble damage the amount based upon the willful, as the court viewed, the willful nature of your client's behavior in this case. So isn't there a basis for this $31 million determination? I think there's a basis. I don't think it's a good one. My clients, for example, my individual clients, Ron Devine was accused only of about $20,000 in transfers. Brenda Devine was accused of taking a little under $60,000 in transfers. Those were the original accusations in the complaint. They ended up getting stuck with a $31 million judgment. This judgment is larger than the total debts of the bankruptcy estate. So what it would mean was... Wouldn't it have been to your client's advantage to actually turn over the documents that were sought in discovery to provide, from your perspective, a more significant view as to what the damage determination should be? I don't think it would have been. I think I'm of the opinion that as much discovery as can be produced is good. I agree with that. My clients at least claim that they produced as much as they had. This, again, is a very large default. And what's being alleged essentially is they kept sloppy records. Sloppy records is not the same... The difficulty is here, as I read the record, that what you did was virtually unprecedented. I mean, what you did was to try to grind the entire proceeding to a halt. And what struck me was that the district court exhibited extraordinary patience with your clients. And there were numerous warnings given which were disregarded. In many cases, there were no discovery responses at all. And not only did this district court show extraordinary patience, but when the bankruptcy court wrote an opinion, it was exhaustive and it went into... It was very individualized and it addressed each of the divine affiliates individually. And given the way in which you sought to bring the proceedings to a standstill, and given the district court's patience, and given the thoroughness with which the bankruptcy court actually announced its ultimate conclusion, how do we rule that an abuse of discretion? So, it's not as cut and dry as the bankruptcy court lays out. And I appreciate that it's a little difficult. My client, Ron Devine, started the case as a pro se claimant, which is part of the reason the discovery had issues in the beginning. As a pro se claimant, he honestly... He's an entrepreneur, he's used to doing his own business, and he didn't really know what he was doing. He did a bad job with the discovery at the beginning. But doing a bad job is not the same as taking away somebody's fair day in court. Thank you. Thank you, sir. Appreciate it. We've got some rebuttal time. Mr. Huston. May it please the court. Andrew Huston on behalf of Matthew W. Smith, who is the appellee and the plaintiff in the bankruptcy litigation below. Mr. Smith respectfully asked this court to affirm the United States District Court for the Western District of North Carolina order and opinion that was entered March 5th, 2024, which in turn affirmed four separate orders of the bankruptcy court. As a preliminary matter, panel, I address that the plaintiff submits there are dispositive or key decisional issues as it relates to each of those four orders that are addressed in the district court's order. I'd like to address three of those four orders very briefly at the beginning and then spend the time for our conversation addressing the discovery sanction order. And so those four orders are as follows. The order holding Ronald Devine in civil contempt. I submit the district court should be summarily affirmed on this matter as the appellants failed to address that matter before the district court. And given this issue was waived in district court, it of course did not abuse its discretion in affirming that order. The case that's cited is N. Ray Wallace and Gale Company from the Fourth Circuit. The second order that I believe doesn't bear a lot of discussion is the order granting Mr. Smith's motion for protective order and denying a motion to compel for the same reasons, waiver. That is embodied in the district court's opinion also. And then as it relates to the judgment, the district court's order on this point should similarly be affirmed. The district court did not abuse its discretion by affirming the judgment where the Devine parties informed the bankruptcy court at a hearing on December 6, 2022, that they agreed with our calculation of the damages, that the damages set forth in the complaint were for a sum certain, and they did not need a hearing to attempt to liquidate or contest the amount of that judgment. The case that's cited by the district court, they cited an unpublished case from this court called Williams v. Lynch. They also cited a case called Lynch v. Massini-Holdings from the Second Circuit, which stands for the proposition, quote, the failure to raise an argument in bankruptcy court constitutes waiver even if the argument is subsequently raised in the district court, close quote. I don't plan to spend any more time talking about those orders unless you have any questions. I'd like to focus on what we call the discovery sanction order, which is the 70-page opinion from Judge Whitley in bankruptcy court. In getting to that, the $31 million, that seems to be the subject that we're discussing here, is not specifically requested in the complaint. Do you agree with that? I do not. In fact, let me explain how that number was calculated. That was going to be my next question. Walk us through that. Yes. So the complaint, contrary to what was represented, the complaint sought to avoid and recover transfers totaling approximately $6.4 million that were paid to or for the benefit of the defendants. The defendants, of course, are Brenda Devine, Mr. Devine, seven wholly owned companies and entities, and three family trusts. The claims that were asserted also included breach of fiduciary duty claims related to Mr. Devine and Mrs. Devine causing the debtor to incur $12 million, a company assuming its owner's debts. Those claims, the breach of fiduciary duty claims related to the $12 million, those are not trebled under North Carolina law. The other claims are, they're considered unfair and deceptive trade practices when parties engage in a pattern of concealment and secreting assets. And under North Carolina law, the Unfair and Deceptive Trade Practices Act, there is mandatory trebling of damages in that instance. My suggestion is the $6,376,366.66 are those items which are trebled? Yes, sir. Yes, so that figure is trebled. The roughly $12 million is not trebled. So that is what builds into that $31 million figure. And again, back to the record, the Defendant Appellants Council below, we had a hearing December 6th. They agreed. I mean, they told Judge Whitley in bankruptcy court that although they certainly disagreed with the result, they said they agreed that the amount was for a some certain and that they agreed with our calculation. And they did not need a hearing on that matter. That is in the record. The transcripts are even in the record here. It seems to me that the appellants are objecting to any sanction at all and that imposing a sanction by virtue of default judgment was just an abuse of discretion from the get-go. They certainly say that, Your Honor. I believe that position ignores the very lengthy record, which includes the significant prejudice to Mr. Smith. And that is a question Mr. Coppola said there was no prejudice. I beg to differ significantly on that point. And I'd like to talk a little bit about that. The claims that we brought in the complaint, as I mentioned, unfair trade practices claims, civil conspiracy claims, fraud claims, stories, excuse me, allegations of alter ego based on this Byzantine series and sequence of corporations and shell entities that were controlled by the divines. The documents that were not produced were staggering. And I'd like to just rattle off a list of some of these documents just to consider. And I think I would ask the Court to consider my remarks in light of your precedent in the mutual federal savings and loan case as well as the May case. They're both cited in our brief. But I want to discuss those cases. It relates to these failures. The documents that the defendant, the appellants, the divine parties, failed to produce in response to discovery were staggering. Tax returns, bank account records, financial statements, accounting software in native format, loan documents and ledgers, corporate records showing the management and ownership of entities. They didn't produce any communications whatsoever related to the challenged transactions. There was nondisclosure of alleged loans that were made to the debtor. There were undisclosed bank accounts. Mr. Smith and I independently found 54 or 57 bank accounts that they failed to disclose in response to interrogatories. There were undisclosed entities. I believe, Judge Wilkinson, you were correct that there were 54 entities that weren't disclosed who Mr. Divine testified also had bank accounts. He just didn't know at what banks or where they were. The only point I was trying to make is I've seldom seen such an extensive scheme with 54 shell entities or whatever that was constructed with the idea of bleeding the bankruptcy estate and not only bleeding the bankruptcy estate but bringing the court proceeding to a standstill. They wanted to do both things, to deplete the bankruptcy estate and also bring the court proceeding to a standstill so that the bankruptcy court could not inform itself of the full extent of what they were doing. But I think it's fair to call this unprecedented because I've never seen or seldom seen such an extensive scheme that was designed to enrich the Divine affiliates at the expense of the estate and also to bring to a screeching halt the wheels of justice when it tried to discover what in the world they were doing. It's a sad, sad story. It is, Your Honor, and it has been going on since 2018. And in Judge Whitley's opinion, there are references made to this, I believe in the district court opinion as well, the case started that way. When the bankruptcy case itself was filed in February of 2018, it'll be seven years this coming February, Mr. Divine, Mrs. Divine filed this case. It's a bankruptcy case. They ran, operated the debtor. Mr. Divine managed the operations. Mrs. Divine was the managing member. And they filed the case, and they refused to follow any norms from day one. Your opponent colleague has suggested that $31 million here is unduly severe. That's their basic position. And you've made reference to the fact that under North Carolina law, the damages can be troubled. Is that something that was obligatory on the court, or did the court have discretion as to whether it wanted to use that formula for determining damages? With respect to troubling, it is mandatory. Under North Carolina's Uniform, excuse me, Unfair and Deceptive Trade Practices Act, there is no discretion. It is mandatory that if there are damages, those damages are troubled. About the documents, there's a, they, in their briefs, they submitted over 900,000 pages. But I can't seem to find, with the district court, there's no fact-finding, I guess, I mean, from the bankruptcy court regarding the documents. Because they're saying that they submitted over 900,000. Yeah, so let me clarify what I believe they're saying and then explain to you why they're wrong and what actually is going on. They absolutely did not produce 900,000 pages, or there was a later filing in their reply brief that suggests there was 7.7 million pages of documents. That is just not the case. What they have referred to is what we in bankruptcy court call the quote-unquote trustees file. It is the information that the trustee amasses as part of his investigation. Mr. Smith, as the record shows, he was appointed as the bankruptcy trustee, and he ran a NASCAR team, a professional sports team, for about six months after Judge Whitley removed the Devines from the management of the company. He then presided over the marketing and sale of the business, and then he has served as the trustee since. The information that they're talking about is the trustees file. We provided the trustees file to Mr. Devine and his counsel, and there were some other defendants that the same lawyers represented in the bankruptcy court. That's just information that Mr. Smith gathered while serving as trustee. What is in that file, I think, is pretty compelling. What is in it and what is not. First, I would start by saying there is literally nothing in the record that supports what they've said. There's no findings about those documents, the data. The reason there aren't is because the information contained has nothing to do with the discovery we've been talking about. What is in that file, pleadings from the bankruptcy case, audio files from the bankruptcy case, transcripts, documents and financials that Mr. Smith amassed when he was serving as the trustee. There are pictures of NASCARs. There's pictures of tires. There's pictures of engines. There is some limited information that he obtained. That's it. There's 8,000 files. There's not 90,000 pages of documents. From our standpoint, with the review, what is not in there are any of the documents that the defendants failed to produce. And I went through a partial list and I would add to that list the defendants. It's an odd situation. You have a bankruptcy case. The people who ran the company, they maintained the emails for the company's key officers. Its CFO, its president, its bookkeepers, the assistant for the president on another email server. All of that's gone. So we didn't have access to the CFO's emails, these people. And I think to make a technical argument here, the way that the court should consider that is there was certainly no reversible error. The defendant appellants can't point to some abstract amount of data and claim that the trial court or the district court committed error. And there is a reason they've never tried to tell you or more specifically point to the record to show what was actually in that file is because it doesn't actually help them. They're just pointing to some superficial amount of data to try to make the point that we had enough documents without actually telling you what the documents are. And again, that's not in the records. From our standpoint. It matters from a broader lens. I think there are some cases in which it's important for an appellate court to back a district court up. This strikes me as one of those sorts of cases given what the bankruptcy judge and the district judge were subjected to. They're just trying to gain control of their own proceedings in their own court. And an appellate court, I think, should be cognizant of that and back them up on it. And the other thing with respect to this, this has gone on and on and on, but I think it's important to send a signal that this sort of behavior is not going to be tolerated. And given what went on here, it seems to me that there is some value in saying this kind of thing is not going to be tolerated. And again, what struck me is the extraordinary patience that was shown in the face of extraordinary provocation. And from our standpoint, we agree with that 100%. And I would be remiss if I didn't say it concerns me that there would be an opinion that would take the position of the divine parties in this case, which would go back and effectively countenance the way that they have treated Judge Whitley in bankruptcy court from day one, the way that they have withheld material information from creditors from day one. And you will see, I'm sure we've cited in our brief, that Mr. Divine in the very first days of this case was telling the debtor's bankruptcy lawyer that he did not want to provide information to fill out the bankruptcy schedules. And I know you guys don't deal with bankruptcy every day. I do. But the bankruptcy schedules are a very important document that's filed in a bankruptcy case. It discloses assets and liabilities of the company, and it discloses all the transactions with insiders and related parties over a specific period of time. And the reason that Mr. Divine cited was that he didn't want to give the enemies any more ammo. You say something that let the lawyers fight it out or something like that? And that was the next point, which was said to Mr. Smith, the day after he was appointed as the trustee. He told Mr. Smith that if Mr. Smith took the side of creditors. Now, this is a person who was appointed as a fiduciary for the benefit of creditors in a bankruptcy case to maximize the assets for creditors. Mr. Divine, the person who ran the company when all of these debts were incurred, told him, if you take the creditor's side, I will be your number one enemy, and I will let the lawyers fight forever. That was seven years ago, almost, that that statement was made. In March of 2018, and here we are. That is how this case has proceeded over the last roughly seven years, and it should stop. Your Honors, I am getting a little bit short on time, so I want to focus really on the issue of prejudice. And I would ask you to consider two cases that we've cited in our brief, and I would ask you to, I'm going to expand on this a little bit. They're the Mutual Federal Savings and Loan case, which is a 1989 case, and then there's also the May versus Phillips case. That's a case from last year, from 2023, and I see a lot of parallels between those two cases and this case. In our case, I believe it's actually a lot stronger, but those cases are as follows. Mutual Federal Savings and Loan, the plaintiff brought a complaint sounding in breach of contract, fraud, RICO, civil conspiracy, excuse me, conversion. It had a very tortured posture, like our case, of discovery, objections, motions, hearings, sanctions, et cetera. And the key issue there were the documents that were withheld. What were those documents? Bank records, the identity of, excuse me, the identity of lenders and related agreements, complete information about bank accounts, corporate financial books and records, just like our case. The district court in that case affirmed, excuse me, the district court entered an $8.9 million default judgment, which is a very large number in the 80s. It's a very large number today. Very large number today as well. And this court affirmed, saying as follows, the plaintiff suffered great prejudice as a result of the defendant's misconduct because plaintiff could not prove its case without the business and bank records withheld, which the trial judge described the materiality as essential. This court affirmed on those facts, just like in our case. The May versus Phillips case, which is a case decided last year, very similar. There were claims brought under the Telephone Consumer Protection Act and related statutes. There were claims of alter ego, transferring of assets, very similar tortured posture. What were the documents that the defendants withheld in that case? Tax and financial records, transaction-related documents, corporate records, e-mails. This court's termed the defendants engaged in sandbagging and producing documents after relevant deadlines. There were false representations made by the defendants, undisclosed high-dollar transactions, undisclosed entities. Sounds a lot like this case. Based on those failures, the district court in that case applied the Wilson factors, which is the test for determining whether default judgment is proper, entered a default judgment in the amount of approximately $828,000. On the issue of prejudice, this court said, appellant's failure to disclose this information not only deprived Apolli of discoverable information necessary to prove her claim, but it also caused delays in the litigation and considerable expense to Apolli because her counsel had to spend time researching and uncovering information appellants should have properly disclosed but chose to withhold. The court found prejudice. This court affirmed, based on the materiality of these documents, our case is just like those two cases and, in fact, in my opinion, substantially worse. This has been going on for seven years, and it should stop. Thank you. Mr. Copley, you've got some rebuttal time. All right. I think I'll start off by talking about the entities. I know there was the discussion of 54, some undisclosed, 12 being total as my clients. Mr. Devine was in business for a lot of years. He had a lot of companies. One of his companies, for example, he was a Burger King operator. Burger King said they were going to start making pizza, or at least this was the rumor. So he made a pizza LLC, had a bank account, started up, and then went nowhere, turned into nothing. And he made these. He did these over years. I want to talk a little bit about my client, Ron Devine. I want to talk about the outcomes of this case, because I think the outcomes are important. I know there was some discussion about giving the trial court the leverage it needs to manage its courtroom. And I think that, in my opinion, trial courts need very broad latitude to manage the cases that come in front of them. This doesn't mean unlimited latitude. There's still checks on it. There needs to be a due process check on it. We're talking about basic principles of litigation, and I consider discovery basic principles of litigation. And there's at least a strong suggestion that that process is being undermined. Doesn't the court have the ability to try to remedy those situations with specific sanctions? It does have the ability to remedy them with specific sanctions. But certain sanctions, especially, I think you need to balance the weight of the value and the ability of the court to remedy it versus the prejudice that the sanction places on the people. For example, say a court were to sanction somebody who was not a litigant in front of that court. I think that would be out of bounds because of due process. They need to actually be brought in front of that court. That would be too far. Anyway, in this case, I think what matters is you see the ultimate results of what happened from the court. Ron Devine is somebody who's been in business for 30 years. He had a lot of different companies. He employed 750 people at a time, thousands over the years. He was honestly a rich man. He lost $47 million of his own money racing NASCAR. He put $29 million in cash into the team. He lost it all. The thing I like most about Ron is he's not bitter about his losses. He just wants to get back to building his business. But the issue is there's this $31 million judgment against him. And he doesn't have $31 million. Brenda doesn't have $31 million. None of these companies have $31 million. The $31 million is larger than the total debt of the bankruptcy estate. Let's talk about it again. We are sensitive to the challenges that individuals have when they're involved in situations. We try to be fair and benevolent and all that. But the bottom line is that the sanction, the trouble-damage sanction, could have been avoided if your client had followed through on his obligation to meet the discovery requirements and guidelines. In other words, we might not have had $31 million, but for your client's actions. I mean, that's, I would say, you know, my clients did produce discovery. I think they didn't produce it to Mr. Houston's pleasure. This is not the only case out of this constellation of cases from this bankruptcy where discovery has been an issue. Mr. Houston has alleged that the discovery was inappropriate in several other cases. He's gone after Ron Devine's secretary, Nancy O'Hara. She has Alzheimer's. I was amazed by how much she produced, honestly, but he said it wasn't enough. Right before the same court, got the same result. I think... How can you expect us to accept your view of the case and your view of the facts and all the rest when you fail to provide discovery? In other words, you would be infinitely better served if there had been a full record and you could have argued off the record instead of making lawyers' arguments without sufficient support in the record. But you've made an argument that we should accept this and accept that and your client's circumstances and all of this and what he's doing in business. But it all rings rather hollow when you won't provide the court the information which should furnish support for what you're telling us today. I don't disagree with that. I was not the attorney in the trial court. I'm not blaming you personally because you weren't the attorney at trial and I'm sure you were not responsible for a lot of what went on. But on the other hand, you're representing the client on appeal. And so what went on at trial is your responsibility to defend. Of course. And it comes very near to being indefensible. I understand that. Again, it's this balancing test. It's a question of the fair day in court versus the behaviors. And a part of it is we've kind of gotten into the weeds of the behaviors. I think it should have been decided on the merits. I appreciate the discovery was lackluster. How can it be decided on the merits when the information is on the merits? Mr. Houston had quite a bit of information himself. He got it out of the – there are a number of secondary sources I cite in my brief that talk about default being inappropriate when there is some discovery. And mind you, they answered 86 percent of the interrogatories. It's not perfect, but it's a partial discovery. What I'm saying is rather that it's a partial discovery, it's not a completely incomplete discovery. So in closing, I'd just like to say that – oh, I'm out of time. Sorry. I've got my 50 seconds left. In closing, I'd just like to say this isn't necessarily an easy case. It isn't necessarily a pretty case. There are – I understand the arguments on the other side, but there's this question we have to ask ourselves of whether we want to look at defaults or whether we want to allow due process and have this adversarial proceeding. I think that the court should have tried to somehow have an adversarial proceeding based on what was there. Thank you. All right, we will come down and recounsel and then proceed into our next case.
judges: J. Harvie Wilkinson III, DeAndrea Gist Benjamin, Rossie David Alston Jr.